**UNITED STATES of America, Appellee,**

v.

**Alec BROWN, Jr., Appellant.**

No. 84–5204.

United States Court of Appeals,
Fourth Circuit.

Argued Feb. 8, 1985.

Decided July 18, 1985.

William T. Mason, Jr., Norfolk, Va. (Robinson, Eichler, Zaleski & Mason, Norfolk, Va., on brief), for appellant.

Mark Utecht, Sp. Asst. U.S. Atty., Norfolk, Va. (Elsie L. Munsell, U.S. Atty., Alexandria, Va., on brief), for appellee.

Before WIDENER and ERVIN, Circuit Judges, and BOYLE, United States District Judge for the Eastern District of North Carolina, sitting by designation.

WIDENER, Circuit Judge:

Alec Brown appeals his conviction by a jury under 18 U.S.C. §§ 641 and 2 for willfully and knowingly embezzling, stealing and converting to his own use 28 cases of frozen shrimp, of a value in excess of $100, from the United States Department of the Navy. In addition to various grounds of appeal, Brown, who is black, contends, first, that the trial court erred in refusing Brown's request to ask certain questions on voir dire concerning possible racial bias of jurors. Second, Brown argues that the court erred in admitting hearsay testimony showing Brown's participation in the crime. We decline to accept the first argument but are persuaded by the second, and we vacate Brown's conviction and remand to the district court for a new trial.

During late 1983, Brown was employed as a warehouseman at Building CEP–156, Norfolk Naval Station, Norfolk, Virginia. Building CEP–156 was a cold storage plant which received and stored frozen foods for distribution to naval ships and facilities. Brown's duties there included checking material, loading material and performing paperwork associated with the movement of material from the loading ramp at Building CEP–156.

On November 7, 1983, Special Agent Erling Tonneson of the Norfolk office of the Federal Bureau of Investigation received a telephone call from an informant who told Tonneson that later that day an individual driving a white truck with a trailer would be obtaining stolen shrimp from the cold storage facility at the Norfolk Naval Base. Tonneson then notified the base police of the information he had received from the informant.

Later that same day, Tonneson was informed by the base police that a truck fitting the informant's description had been stopped while attempting to leave the base. The truck belonged to Carlisle Poultry & Egg Company of Burgaw, North Carolina, and was driven by a Lester Norris. Tonneson was further told that, upon investigation, 28 cases of frozen shrimp were found on the truck, hidden behind cartons of eggs.

Following the finding of the shrimp, Norris was arrested and detained by the base police. The shrimp were meanwhile secured and stored in a freezer. Norris was then interviewed as to his involvement in the theft of the shrimp. During the interview, Norris explained that he had received the shrimp from Alec Brown. Norris, who made regular egg deliveries to Building CEP–156, also revealed he and Brown had collaborated on three previous occasions in taking shrimp off the naval base. On these occasions, according to Norris, he would later call a telephone number given to him by Brown, at which time the men would designate a meeting place and divide up the cases of shrimp. The base police informed Agent Tonneson of the contents of the interview with Norris.

As a result of the initial interview with the base police, Norris agreed to cooperate in the further investigation of Brown. The following day, November 8th, Norris presented himself at the local FBI office, was read his rights, and repeated his story to Agent Tonneson. At the request and instructions of the FBI, Norris called Brown that day from the office, and explained to him that he had gotten stopped at the base gate and received tickets for truck violations but that the shrimp was safely in a friend's freezer, and they could meet the next day. Brown told Norris to

call him the next day. This phone call took place in the presence of Agent Tonneson. While an attempt was made to record the conversation, the recording equipment was not operated correctly and no recording was made.

The following day, November 9th, Norris returned to the FBI office and called Brown. During the conversation, which was successfully recorded, Brown instructed Norris to meet him at the Sunshine Trading Company. Agent Tonneson, who was again present during the phone call, then had Norris wired with a recorder and transmitter. Norris then proceeded to the meeting point with the shrimp.

Upon meeting Brown at the Sunshine Trading Company, Norris was instructed to unload the shrimp into a freezer. Brown then paid Norris $255 and departed. Norris returned to the FBI office and relinquished the money. On several occasions which followed, Norris was again wired for recording, and, while making egg deliveries to Building CEP–156, attempted to engage Brown in conversation concerning shrimp. Brown was subsequently arrested in January 1984.

On appeal, Brown makes several assignments of error of which we address two. The first involves the district court's refusal of a request by Brown to ask defendant's Questions 32 and 33 on voir dire examination. The questions were inquiries into possible juror membership in organizations espousing racial hatred or juror support for the attitudes and principles such organizations espouse.[1] Brown contends

that the district court's refusal to ask these questions was an abuse of discretion and reversible error.

In *Smith v. United States,* 262 F.2d 50, 51 (4th Cir.1958), we held that the refusal to permit questions on voir dire examination, asked in good faith, as to membership in the Ku Klux Klan or similar organizations, is reversible error. We affirmed that principle in *United States v. Gore,* 435 F.2d 1110, 1111 (4th Cir.1970); see *United States v. Johnson,* 527 F.2d 1104, 1106 (4th Cir.1975).

Subsequent to our decisions in *Smith, Gore,* and *Johnson,* however, the Supreme Court decided *Rosales-Lopez v. United States,* 451 U.S. 182, 101 S.Ct. 1629, 68 L.Ed.2d 22 (1981). In *Rosales-Lopez,* the defendant was of Mexican descent, and had been convicted in a jury trial for illegally transporting aliens into the United States. During voir dire examination, defense counsel requested the court to ask the questions: "Would you consider the race of Humberto Rosales-Lopez in your evaluation of this case? How would it affect you?" The district judge conducted the voir dire and chose not to ask any question directed specifically at possible racial or ethnic prejudice toward Mexicans or others. He did ask, however, a series of questions concerning juror attitudes about the alien problem, as well as a general inquiry into any prejudices the jurors might have.

On appeal, the defendant challenged the trial court's refusal to question jurors specifically about racial or ethnic bias. The

---

**1.** Questions 32 and 33 were as follows:

32. Are any of you, or any member of your immediate family, a past or present officer, member, contributor, sponsor, sympathizer, or supporter of the American Nazi Party, The Ku Klux Klan, The Knights of the Ku Klux Klan, or the White Citizens Council, or organization bearing a similar name? (If yes)
(a) State the name of the organization and what was your connection (member, officer, contributor, sponsor, sympathizer, or supporter) with that organization.
(b) Do you support the principles of that organization?
33. Objective racism is the outward manifestation of racism. An example would be someone

putting up a sign that he does not want any blacks in his restaurant. Subjective racism is the feeling a person has inwardly. He may not express it by acts or conduct, but within himself he will feel that blacks are lazy. What we are trying to do is to find out whether any of the jurors have any prejudices, and if they have, can they decide the case on its merits rather than on the built-in prejudices that all human beings have in one way or the other? Do any of you have any racial prejudices, whether they are objective or subjective? (If so)
(a) Can you make allowances for any racial prejudice and decide this case on its merits?

Ninth Circuit affirmed the conviction, holding that there was no requirement to ask a racial prejudice question absent "some indication that prejudice is likely to arise, or that the trial will have racial overtones." *United States v. Rosales-Lopez*, 617 F.2d 1349, 1354 (9th Cir.1980). The court found no such circumstances in the record.

In granting certiorari in *Rosales-Lopez*, the Supreme Court noted a "diversity of views" on the issue of when a trial judge must ask a question concerning racial prejudice. *Rosales-Lopez v. United States*, 451 U.S. at 187–188, 101 S.Ct. at 1633–1634. The Court characterized some circuits, including our own, as having "adopted a *per se* rule, requiring reversal whenever the trial judge fails to ask a question on racial or ethnic prejudice requested by a defendant who is a member of a minority group." Id. at 187, 101 S.Ct. at 1634, citing among other cases *United States v. Gore*, 435 F.2d 1110 (4th Cir.1970). The Court then pointed to other circuits as having rejected such a rule, instead choosing to follow the same reasoning as the Ninth Circuit. *Rosales-Lopez v. United States*, 451 U.S. at 187–188, 101 S.Ct. at 1633–1634.

The Court in *Rosales-Lopez* recognized the generalized questions the district court did ask concerning the alien problem and juror prejudices as calculated to reveal racial prejudice, and framed the issue before it as

> whether it was reversible error for a federal trial court in a criminal case to reject the defendant's request that the court's voir dire of prospective jurors inquire *further* into the possibility of racial or ethnic prejudice against the defendant. Id. at 183, 101 S.Ct. at 1632 (emphasis supplied).

We note that Rosales-Lopez was tried in the Southern District of California, which adjoins Mexico, and some of the witnesses apparently were unable to speak English or at least express themselves in English. In this setting, the questions by the district court "Do you have any feelings about the alien problem at all?" and "Do you have any particular feelings one way or the other about aliens or could you sit as a fair and impartial juror if you are called upon to do so?"; "[i]n order that the defendant shall have a fair and impartial jury, it is necessary that we address certain questions to the panel to make sure there are no underlying prejudices, there are no underlying reasons why you can't sit as a fair and impartial juror if chosen to do so in this case," were calculated to ascertain whether any juror harbored any prejudice against Mexicans. These were the principal questions upon which the Court made its finding that there was no reasonable possibility that racial or ethnic prejudice affected the jury, p. 194, 101 S.Ct. at 1637.

With this in mind, we think that if a defendant wishes questions asked as to racial prejudice and sufficient questions are asked on voir dire to disclose possible racial bias against the defendant, although asked in general terms, that *Aldridge v. United States*, 283 U.S. 308, 51 S.Ct. 470, 75 L.Ed. 1054 (1931), does not require more specific questions as to racial attitudes except where circumstances of the case indicate a reasonable possibility that racial prejudice may have influenced the jury, 451 U.S. at p. 191, 101 S.Ct. at 1635, or for violent crimes where the defendant and the victim are members of different racial or ethnic groups. *Rosales-Lopez*, 451 U.S. at p. 192, 101 S.Ct. at 1636. That this is the *Rosales-Lopez* construction of *Aldridge* is agreed upon even by the dissent in *Rosales-Lopez*, p. 202, 101 S.Ct. at 1641.

An analysis of *Rosales-Lopez* bears out this conclusion. By its phrasing the issue as previously set forth, the Court placed the case within the context of its earlier decision of *Ristaino v. Ross*, 424 U.S. 589, 96 S.Ct. 1017, 47 L.Ed.2d 258 (1976). In *Ristaino*, a black male was convicted by a jury in state court of assault and battery against a white security guard. The trial judge conducted the voir dire examination and posed a general question about prejudice or bias, but refused defendant's request to further question jurors specifically on racial prejudice. The Court, affirming the conviction, held that "[t]he Constitution

does not always entitle a defendant to have questions posed during voir dire specifically directed to matters that conceivably might prejudice veniremen against him." Id. at 594, 96 S.Ct. at 1020; see *Ham v. South Carolina,* 409 U.S. 524, 527–528, 93 S.Ct. 848, 850–851, 35 L.Ed.2d 46 (1973). The Court acknowledged that special circumstances can arise where racial issues are "inextricably bound up with the conduct of the trial," requiring questioning specifically directed at racial prejudice. *Ristaino v. Ross,* 424 U.S. at 597, 96 S.Ct. at 1021; see, e.g., *Ham v. South Carolina,* 409 U.S. 524, 93 S.Ct. 848, 35 L.Ed.2d 46. The Court concluded, however, that where the circumstances are merely that the victim is white and the defendant is black, the "demands of due process [were] satisfied by ... generalized but thorough inquiry into the impartiality of the veniremen." *Ristaino v. Ross,* 424 U.S. at 598, 96 S.Ct. at 1022.

Relying on *Ristaino,* and referring to its facts, the Court in *Rosales-Lopez* held:

> There is no constitutional presumption of juror bias for or against members of any particular racial or ethnic groups. As *Ristaino* demonstrates, there is no *per se* constitutional rule in such circumstances requiring inquiry into racial prejudice.... Only when there are more substantial indications of the likelihood of racial or ethnic prejudice affecting the jurors in a particular case does the trial court's denial of a defendant's request to examine the juror's ability to deal impartially with this subject amount to an unconstitutional abuse of discretion. *Rosales-Lopez v. United States,* 451 U.S. at 190, 101 S.Ct. at 1635.

The *Rosales-Lopez* Court did observe that it is generally the best practice, for purposes of assuring a fair trial, for judges to allow the defendant to determine whether a specific inquiry into racial or ethnic prejudice should be made. Id. at 191 and n. 7. Nevertheless, the Court determined that failure to honor such a request would be "reversible error only where the circumstances of the case indicate that there is a reasonable possibility that racial or ethnic prejudice might have influenced the jury." Id. at 191. Finding no such circumstances in the facts before it, the Court found no abuse of discretion and affirmed the conviction. Id. at 194.

■ In view of the facts present in both *Ristaino* and *Rosales-Lopez,* the Court's language from those cases supports our conclusion that, absent special circumstances, a trial judge who has made a general inquiry into possible juror racial prejudice is not required to make a specific inquiry addressed to racial prejudice or bias. The case now before us fits within the confines of this rule. The district judge here, as did the trial judges in *Ristaino* and *Rosales-Lopez,* refused to ask defendant's suggested voir dire questions, which inquired specifically as to juror attitudes toward a racial minority, in this instance blacks. Unlike the trial judges in those cases, however, the district judge here went beyond making a generalized inquiry into juror bias and asked the venire essentially the same questions the trial judge in *Rosales-Lopez* had refused to ask:

> Every litigant is entitled to a fair and impartial trial, regardless of what the litigant may be. It doesn't make any difference what station in life he occupies or who he is. He is entitled to the same fair and impartial trial. But one is not entitled to any fairer trial than another in any case, regardless of what their station in life may be.
>
> As you may observe, the defendant in this case—he is seated at counsel table—is a member of the black race. If any person has any feeling they would have any difficulty in rendering a fair and impartial trial, giving due weight to all of the evidence and testimony in the case, because the defendant or a witness is a member of the black or white race, then they should tell the Court at this time so they may be excused from service.

■ It is thus apparent that the district judge not only importuned the jury that the defendant must have a fair trial regardless of who he is or what his station in life may

be, he made a specific inquiry into the presence of racial prejudice or bias among the jury venire. Absent special circumstances, the form and substance of this question more than satisfies the requirement of *Ristaino* and *Rosales-Lopez* for a general inquiry into prejudice or bias.

Without intending to limit or to restrict the questions a district judge may think should be asked on the subject, we commend the questions put by the district court here as an appropriate response to a defendant's request for an inquiry into possible juror prejudice due to race. Not only does it comply with the best practice referred to in *Rosales-Lopez*, 451 U.S. at p. 191, 101 S.Ct. at 1635, it complies with *United States v. Johnson*, 527 F.2d 1104 (4th Cir.1975), in which we said that a district judge has

> broad discretion ... as to the verbiage and extent of the inquiry. He 'need not ask every single question on [the] subject which the ingenuity of counsel can devise.' A general query whether any juror is unable to judge the case fairly because of race, creed or color of the defendant should suffice. Id. at 1107, quoting in part *United States v. Grant*, 494 F.2d 120, 122–123 (2d Cir.1974), cert. denied, 419 U.S. 849, 95 S.Ct. 87, 42 L.Ed.2d 79 (1974).

Since the defendant alleges no special circumstances which would indicate a reasonable possibility that racial prejudice would affect the jury, we conclude that the district judge did not abuse his discretion in denying Brown's request.

The second assignment of error is the admission of hearsay testimony given by FBI Special Agent Tonneson. We examine the following six statements by Tonneson:

1. Tonneson testified to the conversation he had with his unidentified informant, including the informant's description of the truck and that the truck would contain stolen shrimp.

2. Tonneson testified to the conversations he had with the base police following the arrest of Lester Norris, including the information he received on the circumstances of the arrest and the discovery of the shrimp hidden behind some eggs.

3. Tonneson testified to the information he received from the base police concerning the results of the interview with Norris. He testified that the base police told him that Norris (the truck driver) told them that he (Norris) had gotten the shrimp from Brown and that Brown had given Norris a telephone number where he (Brown) could be reached to arrange the delivery of the shrimp.

4. Tonneson testified to a conversation between Norris and Brown, as told to him by Norris. He testified that Norris told him that Brown asked Norris to take the shrimp out, and told Norris to call that night about delivery of the shrimp.

5. Tonneson testified to what he overheard Norris say during a November 8th telephone conversation between Norris and Brown, although Tonneson did not know Brown was on the other end of the call. Tonneson testified that Norris told Brown why he (Norris) did not deliver the stolen shrimp.

6. Tonneson testified to the contents of his conversation with Richard Lu, owner of the Sunshine Trading Company, including testifying as to the contents of a conversation between Lu and Brown, as reported to Tonneson by Lu. Tonneson testified that Lu told him that he (Lu) purchased the shrimp from Brown.

The government argues simply that the statements are not hearsay because not offered for the truth of the matter asserted. It does not argue that they are admissible under any exception to the hearsay rule. Neither does it argue that they are admissible as the statements of a conspirator made in furtherance of a conspiracy and thus not hearsay.

The argument made by the government is based on the limiting instruction given by the district court on more than one occasion during the trial which typically was "... this is not admitted for the truthfulness of the statement. But it is admit-

ted only [as] a background as to what occurred subsequent to that time, if it is established what did occur."

The first of the statements, that the informant told Tonneson that stolen shrimp would be arriving at the gate in a truck which was described, did not connect Brown with the theft and might well be admissible as background even as hearsay. Certainly standing alone it would not be reversible error absent strained circumstances not present here. The same may be said of the second statement although it proved details of the finding of the shrimp by incompetent evidence.

■ In each of the other conversations, however, Tonneson testified in effect that someone had told him that Brown had stolen the shrimp or was connected with the stealing of the shrimp. The background of the case then, which was proven by hearsay, was that Brown stole the shrimp. It was against the background that Brown stole the shrimp that the balance of the government's evidence was presented, and the effect of the evidence could only have been a substantial bolstering of the government's case by inadmissible hearsay.

We need go no further than the hearsay rule's literal wording to illustrate our point. FRE 802 provides that hearsay is not admissible except as provided by the rules of evidence, rules of the Supreme Court, or Act of Congress. FRE 801(c) defines hearsay as a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted. Since the background of the case which the government proved by hearsay was that Brown stole the shrimp, that is precisely the truth of the matter asserted in each of the statements we have enumerated above except the first and second. Indeed, the relation by Tonneson of what the base police told him that Norris had told them was double hearsay, even more objectionable, of course, because more unreliable than hearsay only once removed. *United States v. Melia,* 691 F.2d 672 (4th Cir.1982). As in the case of *United States v. Carvalho,* 742 F.2d 146 (4th Cir.1984), the strategy of overkill pursued by the government, with little regard to countervailing concerns of undue prejudice, has resulted in a trial which we think was not essentially fair. In the circumstances of this case, with the government setting up the background that Brown stole the shrimp and only thereafter calling witnesses whose testimony tended to show that Brown in fact stole the shrimp, we are of opinion that the limiting instructions of the trial court were insufficient to dispel the resulting prejudice from the introduction of needless hearsay evidence on four separate occasions to prove that Brown stole the shrimp.

We have considered the other assignments of error and are of opinion they are without merit.[2]

The judgment of the district court is vacated and the case is remanded for a new trial.

VACATED AND REMANDED.

---

2. We think it is the better practice for a trial court to permit the reading of the names of the witnesses in a case such as this, where the witnesses are few and no confusion would be caused, in order to see if any of the prospective jurors are acquainted with any of the witnesses. This is in order that the parties may more intelligently exercise their peremptory strikes. Due to the extensive voir dire of the jury in this case, we doubt that the district court's refusal so to permit the witnesses to be identified to the prospective jurors was reversible error.