**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.                                                                No. 94-5065

NORWOOD W. BARBER,
Defendant-Appellant.

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.                                                                No. 94-5115

LINDA K. BARBER,
Defendant-Appellant.

Appeals from the United States District Court
for the Western District of Virginia, at Charlottesville.
James H. Michael, Jr., Senior District Judge.
(CR-92-30024)

Argued: December 5, 1995

Decided: April 5, 1996

Before WILKINSON, Chief Judge, and RUSSELL, WIDENER,
HALL, MURNAGHAN, ERVIN, WILKINS, NIEMEYER,
HAMILTON, LUTTIG, WILLIAMS, MICHAEL, and MOTZ,
Circuit Judges, sitting en banc.

_____

Affirmed by published opinion. Judge Niemeyer wrote the opinion of
the court, in which Chief Judge Wilkinson, and Judges Russell, Wid-

ener, Hall, Wilkins, Hamilton, Luttig, Williams joined. Judge Murnaghan wrote a dissenting opinion, in which Judges Ervin, Michael, and Motz joined.

_____

**COUNSEL**

**ARGUED:** Sa'ad El-Amin, EL-AMIN & CRAWFORD, P.C., Richmond, Virginia, for Appellant Linda Barber; Thomas James Wilson, IV, WILSON & BOWERS, Harrisonburg, Virginia, for Appellant Norwood Barber. Stephen Urban Baer, Assistant United States Attorney, Charlottesville, Virginia, for Appellee. **ON BRIEF:** Robert P. Crouch, Jr., United States Attorney, Charlottesville, Virginia, for Appellee.

_____

**OPINION**

NIEMEYER, Circuit Judge:

Norwood W. Barber and his wife, Linda K. Barber, were convicted of laundering cash proceeds from the sale of marijuana, in violation of 18 U.S.C. § 1956. On appeal they challenge mainly the district court's rejection of their request that voir dire of prospective jurors inquire into possible juror prejudice against interracial marriage. Norwood Barber is black, and Linda Barber is white. They also challenge an evidentiary ruling that allowed an expert witness to give his opinion about how their activities constituted concealment for purposes of money laundering and the sufficiency of the evidence to support their convictions. For the reasons that follow, we affirm.

I

For years, Norwood Barber was a confessed marijuana dealer in the Harrisonburg, Virginia, area. In conversations with Harrisonburg police officers, he has mused that the only thing that he can do in life is to sell marijuana. Linda Barber worked for the local chapter of the Society for the Prevention of Cruelty to Animals.

2

Over a five-year period beginning in 1984, the Barbers opened five joint accounts in various banks and, as often as two or three times a week, deposited large amounts of cash into them, usually in small bills. Typically, a few days later, they withdrew the cash in larger bills. On one occasion, a bank teller asked Linda Barber whether she wanted her withdrawal in the form of a cashier's check, and she replied that she wanted it in large bills. On several occasions, the Barbers made deposits and withdrawals at various banks on the same day. A number of bank tellers became suspicious of the Barbers' banking activity and reported their observations to law enforcement officials.

At various times, Norwood Barber misrepresented his employment to bank officials and others, stating that he was self-employed in the egg delivery or truck driving business. On their federal income tax returns, however, the Barbers represented that Norwood Barber had no income and was unemployed. When later questioned by law enforcement officers about the source of the cash involved in their banking activity, the Barbers stated that they had saved the money over the past ten years under their bed.

The Barbers were indicted in one count for conspiracy to launder drug proceeds and, in six counts, for laundering money from drug sales in violation of 18 U.S.C. §§ 1956(a)(1)(B)(i) and (2)(B)(i). A jury convicted them on all counts, and the district court sentenced Norwood Barber to 70 months imprisonment and Linda to 57 months. This appeal followed.

II

We turn first to the Barbers' contention that the district court committed reversible error in rejecting their request to inquire during voir dire into prospective jurors' prejudice against interracial marriage.

At the beginning of trial, counsel for the Barbers requested that the trial court ask whether any member of the venire would prejudge the defendants because they were partners in an interracial marriage. The government objected to the request, arguing that posing such a question to the venire would "bring in a race issue that really is irrelevant." While asserting that an affirmative answer to his question would not provide a basis for disqualifying a potential juror, Norwood Barber's

counsel stated that it would assist him in exercising his peremptory challenges in an informed manner. He maintained that "race is already injected by the fact that the defendants are sitting there as an interracial couple." Linda Barber's counsel added, "The only reason I like [the question] there is that it literally lets [the jury] know race is not an issue, and we go ahead and we admit the obvious. It is see, look, this is an interracial couple. We all agree race is not an issue." He went on to conclude, "It clears the air. . . . I'd like to clear [the jurors'] subconscious and agree that it is not an issue, a non-issue."

The district court rejected the Barbers' proposed voir dire question, explaining that it "simply injects race into this trial, and I do not want to see that happen." Responding to the argument made by Linda Barber's counsel, the court stated, "If we want to clear the subconscious in this venire, we will be in there for two weeks in voir dire."

The Barbers contend that the district court's ruling was legal error which should be reviewed de novo. They maintain that they had "serious concerns and outright apprehension that there might be jurors on the panel who had serious, if not, principled opposition to interracial marriage." And they argue that "[t]he rights of the Barbers to direct their concerns in the form of voir dire clearly should have overridden the expressed concerns by the Court that such an inquiry would `inject race' into the case."

While voir dire serves an important role in furthering the defendant's Sixth Amendment right to trial by an impartial jury, its conduct must be committed to the good judgment of the trial judge whose "immediate perceptions" determine what questions are appropriate for ferreting out relevant prejudices. Rosales-Lopez v. United States, 451 U.S. 182, 189 (1981) (plurality opinion). The trial judge is in the best position to make judgments about the "impartiality and credibility" of potential jurors based on the judge's "own evaluations of demeanor evidence and of responses to questions." Id . at 188. For that reason trial courts are given "broad discretion as to the questions to be asked." Id. at 189 (quoting Aldridge v. United States, 283 U.S. 308, 310 (1931)); see also Fed. R. Crim. P. 24(a). Accordingly, we review a district court's refusal to ask requested voir dire questions for abuse of discretion. See United States v. Brooks, 957 F.2d 1138, 1144 (4th Cir.), cert denied, 505 U.S. 1228 (1992).

4

We cannot ignore continuing incidents of racial prejudice that infect the dispensation of justice. Racial prejudice is a persisting malady with deep and complicated historical roots. But every criminal trial cannot be conducted as though race is an issue simply because the trial participants are of different races. If racial prejudice is ever to be eliminated, society's general concerns about such prejudice must not be permitted to erode the courts' efforts to provide impartial trials for the resolution of disputes. Because "[t]here is no constitutional presumption of juror bias for or against members of any particular racial or ethnic groups," Rosales-Lopez , 451 U.S. at 190, the courts must begin every trial with the idea of not focusing jurors' attention on the participants' membership in those particular groups. Particularly because we are a heterogenous society, courts should not indulge in "the divisive assumption . . . that justice in a court of law may turn upon the pigmentation of skin, the accident of birth, or the choice of religion." Ristaino v. Ross, 424 U.S. 589, 596 n.8 (1976).

Moreover, to seek out generalized prejudices during the voir dire would quickly divert the trial's focus from the guilt or innocence of the defendant to peripheral factors, such as the defendant's race or religious beliefs, which are usually irrelevant to the merits of the case. The very process of exploring such factors would heighten their role in the decisionmaking process and tend to subvert the court's express admonition to jurors to convict or acquit only on the evidence before them without partiality to any party.

Even though generalized prejudices should therefore not routinely be made a subject of inquiry during voir dire, it is also clear that when prejudice threatens the fairness of the process or the result, such an inquiry is required to eliminate that prejudice. When racial issues are "inextricably bound up with the conduct of the trial," the constitutional guarantee of a trial by an impartial jury requires that a court not refuse a request for voir dire directed to racial prejudice. Rosales-Lopez, 451 U.S. at 189 (quoting Ristaino, 424 U.S. at 597). This circumstance may occur when race is an issue to be tried either as an element of the offense or a defense or where racial issues are connected with the resolution of relevant facts.

Even if racial issues are not "inextricably bound up with the conduct of the trial" -- the standard underpinning the constitutional man-

5

date -- a federal court may abuse its discretion in refusing to inquire into racial prejudice if there is a "reasonable possibility" that racial prejudice will influence the jury. Rosales-Lopez , 451 U.S. at 191. Under this non-constitutional standard, courts should exercise their discretion on a case-by-case basis, taking into account the totality of the circumstances. Id. at 192. See, e.g., United States v. Okoronkwo, 46 F.3d 426, 433-35 (5th Cir.) (no error in refusing to question prospective jurors about racial and national origin bias where Nigerian participated in a conspiracy to file false income tax returns and defendant was concerned that Nigerians had a reputation in Texas for fraud), cert. denied, 116 S. Ct. 107 (1995); United States v. Kyles, 40 F.3d 519, 524-26 (2d Cir. 1994) (no error in refusing to question prospective jurors about racial prejudice where black defendant committed armed robbery against whites because the level of violence was insufficient to "ignite a jury's potential prejudices"), cert. denied, 115 S. Ct. 1419 (1995).

In sum, absent special circumstances of a constitutional dimension -- where racial issues are "inextricably bound up with the conduct of a trial" -- the conduct of voir dire is left to the trial court's broad discretion, and we may find an abuse of discretion in a federal court's refusal to ask prospective jurors about racial prejudice only when (1) such a request has been made and (2) there is a"reasonable possibility" that racial prejudice might influence the jury.

In the case before us, the charges against the Barbers did not involve any element relating to race. Nor was the race of any participant an element of a legitimate defense. Moreover, the proof of facts at trial did not introduce race as an issue in the case. All seven counts of the indictment related to the financial question of whether defendants laundered money. The record is replete with evidence concerning the nature and complexity of the Barbers' financial transactions at five different financial institutions and concerning whether, in carrying out those transactions, the Barbers laundered the proceeds of drug sales in violation of 18 U.S.C. § 1956. The only reference to race in the record is the Barbers' argument to the court during voir dire that jurors could see that Norwood Barber is black and Linda Barber is white. We cannot conclude solely on this basis that racial issues were "inextricably bound up with the conduct of the trial."

6

While the record presents no indication that the constitutional guarantee of a fair trial required voir dire into racial prejudice in this case, we must still determine whether the district court abused its discretion under the non-constitutional standard. While the Barbers did make a request for voir dire into racial prejudice, they failed to establish a "reasonable possibility" that racial prejudice might influence the jury. The only fact the Barbers relied on was that the jury could see them sitting there as an interracial couple. While counsel for Linda Barber agreed that "race [was] not an issue," he requested voir dire into racial prejudice because it would "clear the air." The desire to "clear the air," however, does not establish a "reasonable possibility" that racial prejudice might influence the jury. The Supreme Court rejected similar arguments in Rosales-Lopez, holding that voir dire on racial prejudice was not required even though the defendant, a Mexican American charged with illegally bringing Mexican aliens into the country, cohabitated with the daughter of a white woman who served as a government witness. 451 U.S. at 193-94.

The dissent observes that antimiscegenation laws, which were held unconstitutional roughly 30 years ago, reflected a "prevalent social view" that mixed-race marriages were wrong and notes that "deep-seated sexual taboos . . . take time to dissipate." While acknowledging that "without doubt attitudes have changed over time," the dissent notes, "The fact remains, no matter how much we dislike it, that we do not live in a color blind world." The dissent concludes, therefore, that the district court committed reversible error by refusing to inquire about prospective jurors' feelings about mixed-race marriages.

As unjust as our history of racial discrimination has been and as serious as the problem of racial prejudice continues to be, we do not believe that such problems are ameliorated by elevating jurors' views about miscegenation into relevant issues in routine money laundering cases, absent some particularized need. Just as "the raw fact of skin color" is not relevant in determining "the objectivity or qualifications of jurors," Powers v. Ohio, 499 U.S. 400, 410 (1991), skin color of defendants is not an appropriate subject about which to inquire of prospective jurors when the sole issue for the jury is whether defendants are guilty of a financial crime.

To effectively ensure impartial juries and, indeed, equal protection generally, courts must focus remedies on specific racial prejudice,

7

rather than on the effects of "past societal discrimination." See City of Richmond v. J.A. Croson Co., 488 U.S. 469, 505 (1989). In Croson, the Court cautioned that basing particularized remedies on "past societal discrimination" would "open the door to competing claims for `remedial relief' for every disadvantaged group" and, thereby, undermine the very aspirations of the Equal Protection Clause. "The dream of a Nation of equal citizens in a society where race is irrelevant . . . would be lost in a mosaic of shifting preferences based on inherently unmeasurable claims of past wrongs." Id. at 505-06; see also Podberesky v. Kirwan, 38 F.3d 147, 155 (4th Cir. 1994), cert. denied, 115 S. Ct. 2001 (1995). Analogously, conducting voir dire based on historical views about miscegenation in a case that does not present racial issues unnecessarily risks introducing such issues and, moreover, could open the door to voir dire demands relating to every societal prejudice. We decline to force courts down that road by requiring them to conduct such voir dire.

Moreover, we believe that the district court soundly decided in this case that voir dire questions about interracial marriage were inappropriate. The court expressed concern that to ask such questions would "inject[ ] race into this trial" and explained that it did "not want to see that happen." We agree with the court that a line of questioning about interracial marriage would have created the greater risk of injustice, or its appearance, by suggesting that even in a case where race is not an issue, justice turns upon the "pigmentation of skin [or] the accident of birth." Ristaino, 424 U.S. at 596 n.8.

Rather than highlight any one of many generalized prejudices that people may hold, the district court in this case elected -- in the absence of any suggestion that a particular prejudice was inextricably bound up with the Barbers' case or posed a reasonable possibility of harmful influence -- to avoid the risk of creating issues about those prejudices by pursuing a more neutral approach. The first question directed to the prospective jurors was whether they knew of any reason why they could not "hear the facts of this case fairly and impartially and render a just verdict." And the court asked in various contexts throughout the voir dire whether the jury could "hear the facts fairly and render a just verdict." Finally, the court asked the entire venire toward the end of voir dire whether they were able to render a verdict "solely on the evidence presented at this trial, testi-

8

mony from the witness stand, the exhibits and in the context of the law as I will give it to you in my instructions, disregarding any other ideas, notions or beliefs about the law that you may have encountered in reaching your verdict." The jurors that were selected thus had stated under oath that they could render a fair and impartial verdict, based solely on the evidence.

In sum, we hold that the fact that the defendants in this money laundering case were partners in an interracial marriage did not, by itself, require the district court to grant their request to ask prospective jurors during voir dire about their views on interracial marriage. Moreover, we believe the district court better served the needs of justice in this instance by avoiding particularized inquiries into racial prejudice to minimize the possibility that race would play a role in the jury's decision. Accordingly, we cannot conclude that the court's refusal to inquire on voir dire about interracial marriage amounted to an unconstitutional abuse or other abuse of the court's discretion in conducting voir dire.

III

We also conclude that the Barbers' remaining two assignments of error are without merit. First, the Barbers contend that the district court erred in allowing the government's expert witness to give opinion testimony that the Barbers intended to conceal the source or nature of the money involved in the subject financial transactions. They argue that IRS Special Agent Donald Semesky's opinion testimony on Norwood Barber's mental state was inadmissible under Federal Rule of Evidence 704(b).

Federal Rule of Evidence 704(b) provides in pertinent part:

> No expert witness testifying with respect to the mental state or condition of a defendant in a criminal case may state an opinion or inference as to whether the defendant did or did not have the mental state or condition constituting an element of the crime charged or of a defense thereto.

In interpreting this provision, courts have distinguished between expert opinion testimony that describes the significance of a defen-

9

dant's actions to an illegal enterprise from opinion testimony that a defendant had an <u>actual</u> thought or intent. <u>See United States v. Gomez-Osorio</u>, 957 F.2d 636, 642 (9th Cir. 1992); <u>United States v. Gomez-Norena</u>, 908 F.2d 497, 502 (9th Cir.), <u>cert</u>. <u>denied</u>, 498 U.S. 947 (1990); <u>see also United States v. Posters N' Things, Ltd.,</u> 969 F.2d 652, 661 n.6 (8th Cir. 1992), <u>aff'd</u>, 114 S.Ct. 1747 (1994).

In this case, Agent Semesky explained how the Barbers' activities constituted concealment for purposes of money laundering. He testified, for example, that by depositing cash into a bank account and then withdrawing it, the proceeds of drug sales can be effectively concealed at several levels. First, because the deposit slip does not show the bills' denominations, it cannot later be determined that a large number of small bills was deposited. Second, because bills used for buying drugs often retain traces of drugs, the deposit eliminates the possibility of linking the money to the drug trade. Third, depositing drug money into an account that contains legitimate income "lends credence or credibility to the [drug] money." And, finally, withdrawals of large bills facilitate physical concealment because one large bill is easier to conceal than several small ones. Agent Semesky thus concluded, "So, as you can see, there are a number of concealments involved in just that simple series of transactions." When asked why a drug dealer would represent that he is in the egg delivery business to a bank teller filling out a cash transaction form, Agent Semesky gave his opinion that such a misrepresentation would comfort the bank by suggesting that the customer has a legitimate source of income and would add "believability to deposits of some nature into a bank account."

We find no indication in the record that Agent Semesky gave an opinion on Norwood Barber's subjective intent in pursuing a particular activity. Rather, in each instance in which Semesky gave an opinion, he testified that objectively established conduct constituted concealment, an element of money laundering. Thus, we conclude that the district court did not abuse its discretion in admitting Agency Semesky's expert opinion testimony.

Finally, the Barbers contend that the evidence was insufficient to support their convictions. In determining whether the verdict is adequately supported by evidence, we do not engage in weighing the evi-

10

dence. Rather, we determine only whether substantial evidence, taken in the light most favorable to the government, supports the verdict. See Glasser v. United States, 315 U.S. 60, 80 (1942). Having reviewed the record in this case in the light most favorable to the government, we conclude that there was ample evidence from which the jury could have found, beyond a reasonable doubt, that the Barbers committed the offenses for which they were indicted.

For the foregoing reasons, the judgments of the district court convicting the Barbers of conspiracy and money laundering are affirmed.

AFFIRMED

_____

MURNAGHAN, Circuit Judge, dissenting:

The Barbers, defendant-appellants, are a married couple who live in Virginia. Norwood Barber is black; Linda Barber is white. At voir dire, they requested a question on jurors' attitudes about interracial marriage. The district judge refused. The majority has found that the refusal to ask a question on voir dire about attitudes toward marriage between blacks and whites did not constitute reversible error. I disagree, finding that there was a reasonable possibility that prejudice may have influenced the jury against the Barbers as a miscegenous couple.

I.

Up until 1967, the mere fact of the Barbers' marriage would have subjected them to the possibility of criminal prosecution for a felony and one to five years in jail. Loving v. Virginia, 388 U.S. 1, 4 (1967) (citing prior Virginia Code).[1] Antimiscegenation laws reflected a

_____

[1] Virginia was one of 16 states which prohibited and punished marriages based on racial classifications. Loving , 388 U.S. at 6. Those states were: Alabama, Arkansas, Delaware, Florida, Georgia, Kentucky, Louisiana, Mississippi, Missouri, North Carolina, Oklahoma, South Carolina, Tennessee, Texas, Virginia, and West Virginia. In the 15 years preceding

11

prevalent social view that mixed-race marriages were immoral, wrong, and violated the sanctity and purity of the white race. Those laws and social views have roots that go back three centuries in America and, in particular, in Virginia. See generally, Leon Higginbotham, Jr. and Barbara K. Kopytoff, Racial Purity and Interracial Sex in the Law of Colonial and Antebellum Virginia, 77 Geo. L.J. 1967 (1989); Walter Wadlington, The Loving Case: Virginia's Antimiscegenation Statute in Historical Perspective, 52 Va. L. Rev. 1189 (1966). As the sociologist Gunnar Myrdal wrote in 1944:

> The ban on intermarriage has the highest place in the white man's rank order of social segregation and discrimination. Sexual segregation is the most pervasive form of segregation, and the concern about `race purity' is, in a sense, basic. No other way of crossing the color line is so attended by the emotion commonly associated with violating a social taboo as intermarriage and extra-marital relations between a Negro man and a white woman. No excuse for other forms of social segregation and discrimination is so potent as the one that sociable relations on an equal basis between members of the two races may possibly lead to intermarriage.

Gunnar Myrdal, An American Dilemma 606 (1944) (emphasis omitted), quoted in, Higginbotham, supra, at 2025. Indeed, the taboo against marriage between blacks and whites was so strong that antimiscegenation statutes constituted the last major category of legally enforced discrimination based solely on race. Wadlington, supra, at 1211.

In 1927, the Virginia legislature passed "An Act to Preserve Racial Integrity," which prohibited marriage between whites and blacks or

_____

the Loving litigation, 14 additional states had repealed laws outlawing interracial marriages: Arizona, California, Colorado, Idaho, Indiana, Maryland, Montana, Nebraska, Nevada, North Dakota, Oregon, South Dakota, Utah, and Wyoming. Id. at n.5.

The Loving opinion and the Virginia antimiscegenation statute it struck down as unconstitutional are nowhere mentioned or recognized by the majority.

12

any other nonwhites as defined by statute. <u>Loving</u>, 388 U.S. at 6. The 1927 statute was one in a long line of legal prohibitions against inter-racial sexual relations and marriage.**2**

The antimiscegenation laws and prohibitions were the legal mani-festations of an often violently enforced taboo against sexual relations between white women and black men.**3** That taboo and its legal mani-festations sought to preserve the racial purity of white women's chil-dren and a rigid caste system in the South.**4**

Far from having abated, the social attitudes that led to and sup-ported the antimiscegenation statutes continued to support antimisce-genation laws in Virginia well into the latter half of the 20th century, despite the demise of slavery. Higginbotham, <u>supra</u>, at 2021. That sentiment is evident in the Virginia trial court opinion which con-victed the Lovings, an interracial couple, of violating Virginia's antimiscegenation statute in 1959:

> Almighty God created the races white, black, yellow, malay and red, and he placed them on separate continents. And but for the interference with his arrangement there would be no cause for such marriages. The fact that he separated the races shows that he did not intend for the races to mix.

<u>Loving</u>, 388 U.S. at 3. That same sentiment is also evident in the Vir-ginia Supreme Court of Appeals opinions which upheld challenges to the constitutionality of Virginia's antimiscegenation statute in 1955 and in 1966.**5** In 1955, the Virginia Supreme Court of Appeals looked

_____

**2** The first known Virginia statute punishing interracial sexual relations was enacted in 1662. Act XII, 2 Laws of Va. 170, 170 (Hening 1823) (enacted 1662), <u>cited in</u>, Higginbotham, <u>supra</u>, at 1993. As early as 1691, Virginia had enacted a statute punishing interracial marriage. Act XVI, 3 Laws of Va. 86, 86-87 (Hening 1812) (enacted 1691), <u>cited in</u>, Higgin-botham, <u>supra</u>, at 1995. The punishment in 1691 for marriage between an English or white individual and a black, mulatto, or Indian was ban-ishment and removal from Virginia forever. <u>Id.</u>
**3** <u>See</u>, <u>e.g.</u>, Higginbotham, <u>supra</u>, at 2008-09; Myrdal, <u>supra</u>, at 607.
**4** Higginbotham, <u>supra</u>, at 2008, 2019.
**5** The Virginia Supreme Court of Appeals was Virginia's highest court. It is now called the Virginia Supreme Court.

to multiple other state courts which had upheld the constitutionality of antimiscegenation laws to support the constitutionality of Virginia's statute. Declaring that those decisions were valid, it reasoned that "the natural law which forbids the[ ] intermarriage [of blacks and whites] and the social amalgamation which leads to a corruption of races is as clearly divine as that which imparted to them different natures." Naim v. Naim, 87 S.E.2d 749, 752 (Va.), vacated and remanded, 350 U.S. 891 (1955), aff'd, 90 S.E.2d 849 (Va.), motion to recall mandate denied and appeal dismissed, 350 U.S. 985 (1956). The antimiscegenation laws in Virginia were constitutional according to the Virginia court because they "preserve the racial integrity of [Virginia's] citizens," prevent a "mongrel breed of citizens," and "prevent the obliteration of racial pride." Id. at 756. In 1966, the Supreme Court of Appeals of Virginia reaffirmed its earlier reasoning in Naim when it denied an interracial couple's challenge to the constitutionality of the Virginia antimiscegenation statute. Loving v. Commonwealth, 147 S.E.2d 78 (Va. 1966), rev'd, 388 U.S. 1 (1967).

Not until 1967 did the Supreme Court address the constitutionality of antimiscegenation laws.[6] In Loving the Court ruled that Virginia's antimiscegenation statute violated the Equal Protection and Due Process Clauses of the Fourteenth Amendment to the United States Constitution. Loving, 388 U.S. at 11-12. The fact, however, that nine men on the Supreme Court struck down Virginia's antimiscegenation statute did not result in attitudes changing overnight in Virginia, a state where for over 300 years there had been strong social, legal, and sexual taboos against interracial marriage. The Virginia antimiscegenation statute was on the books in 1967 because a popularly elected legislature had not acted to repeal it.

_____

[6] A few months following its decision in Brown v. Board of Education, 347 U.S. 483 (1954), the Supreme Court denied certiorari to an appeal challenging Alabama's antimiscegenation law. Jackson v. State, 72 So.2d 114 (Al.Ct.App.), cert. denied, 72 So.2d 116 (Al.), cert. denied, 348 U.S. 888 (1954). The Supreme Court also refused to rule on a challenge to Virginia's antimiscegenation statute in 1955, by determining that the record before it was incomplete with respect to the domicile of the parties. Naim v. Naim, 87 S.E.2d 749 (Va.), vacated and remanded, 350 U.S. 891 (1955), aff'd, 90 S.E.2d 849 (Va.), motion to recall mandate denied and appeal dismissed, 350 U.S. 985 (1956).

14

Without doubt attitudes have changed over time. However, deep-seated sexual taboos of the sort at issue here take time to dissipate. In 1968, the Gallup Poll Organization asked the public how it felt about interracial intermarriage. At that time, 72% of Americans disapproved of interracial marriages.**7** While attitudes have somewhat changed since 1968, a significant percentage of the population still holds negative attitudes about marriage between blacks and whites. In 1991, according to a Gallup Poll, 42% of Americans disapproved of marriage between blacks and whites. In the South the percentage of disapproval was shown to be 54%.**8**

The above polling data indicates that a significant portion of the population continues to disapprove of the Barbers' decision to marry one another. Their marriage violated social, sexual, and, until recently legal, taboos deeply imbedded in American culture, particularly in the South. The fact remains, no matter how much we dislike it, that we

_____

**7** George Gallup, Jr. and Dr. Frank Newport, For First Time, More Americans Approve of Interracial Marriage than Disapprove, The Gallup Poll Monthly, Aug. 1991, at 60-62.
**8 Id.** Gallup defines the South as including Alabama, Florida, Georgia, Kentucky, Mississippi, North Carolina, South Carolina, Tennessee, Virginia, Arkansas, Louisiana, Oklahoma, and Texas.

The results of the Gallup Poll are based on telephone interviews of 990 adults, eighteen years of age and older, conducted June 13 through 16, 1991. A total of 303 interviews were completed with black individuals, with the national random sample being supplemented by a sample targeted toward areas known to have higher densities of blacks. Six hundred and fifty interviews were conducted with whites, and 36 with individuals who identified themselves as "other." The question posed to respondents was "Do you approve or disapprove of marriage between blacks and whites?"

The Gallup Poll organization reports that "[f]or results based on the total sample of 990, one can say with 95 percent confidence that the errors attributable to sampling and other random effects, could be plus or minus 4 percentage points. For the black sample, the comparable figure is plus or minus 6 percentage points. In addition to sampling error, question wording and practical difficulties in conducting surveys can introduce error or bias into the findings of public opinion polls." Id. at 61.

15

do not live in a color blind world and that many individuals still harbor negative attitudes and feelings about marriage between blacks and whites. To deny that fact is to ignore a social reality, a reality that demonstrates something--namely attitudes toward marriage between blacks and whites--which someone like the Barbers would need to know when attempting to secure an unbiased and fair jury.

## II.

Voir dire examination "plays a critical function in assuring the criminal defendant that his Sixth Amendment right to an impartial jury will be honored." Rosales-Lopez v. United States, 451 U.S. 182, 188 (1981). The voir dire "serves the dual purposes of enabling the court to select an impartial jury and assisting counsel in exercising peremptory challenges." Mu'Min v. Virginia , 500 U.S. 415, 431 (1991). The right of peremptory challenge has been recognized by the Supreme Court as "one of the most important rights secured to the accused." Swain v. Alabama, 380 U.S. 202, 218-19 (1965) (quoting Pointer v. United States, 151 U.S. 396, 408 (1894)), overruled on other grounds, Batson v. Kentucky, 476 U.S. 79 (1986). It is necessary "not only to eliminate extremes of partiality on both sides, but to assure the parties that the jurors before whom they try the case will decide on the basis of the evidence placed before them, and not otherwise." Id.

Federal judges are given wide discretion in their handling of voir dire. The federal constitution, however, requires that the jury be asked about racial and ethnic bias in certain "special circumstances." Ristaino v. Ross, 424 U.S. 589 (1976); Ham v. South Carolina, 409 U.S. 524 (1973). Those circumstances include, for example, instances where racial issues are "inextricably bound up with the conduct of the trial." Ristaino, 424 U.S. at 597.

Aside from the constitutional requirements, the Supreme Court suggests in its exercise of supervisory power over federal courts that an inquiry as to racial or ethnic prejudice is proper where requested by the defendant. Rosales-Lopez, 451 U.S. at 191. Failure to honor a defendant's request for a racial or ethnic question on voir dire, however, is only reversible error "where the circumstances of the case

16

indicate that there is a reasonable possibility that racial or ethnic prejudice might have influenced the jury." Id.

In Rosales-Lopez the Supreme Court found that there was no reasonable possibility of ethnic prejudice and, therefore, approved the district court's refusal to ask no more than a general question regarding prejudice against aliens. The defendant was of Mexican-American heritage and accused of participating in a scheme to bring illegal aliens into the country. The defendant requested that the judge ask on voir dire: "Would you consider the race or Mexican descent of Humberto Rosales-Lopez in your evaluation of this case? How would it effect you?" Id. at 185. The district judge refused to ask that question. He did ask, however: "Do any of you have any feelings about the alien problem at all?" and "Do any of you have any particular feelings one way or the other about aliens or could you sit as a fair and impartial juror if you are called upon to do so?" Id. at 186. The Supreme Court held that the questions regarding attitudes about aliens coupled with the general question on whether the jurors could sit as "fair and impartial" sufficed to root out any possible prejudice against Mexican-Americans as far as voir dire required. [9] "There [could] be no doubt that the jurors would have understood a question about aliens to at least include Mexican aliens." Id. at 193.[10]

---

[9] In fact, the trial court excused two jurors for cause based on their responses to its questions about attitudes toward aliens. Rosales-Lopez, 451 U.S. at 193.

[10] The majority contends that in Rosales-Lopez the Supreme Court rejected similar arguments to those made by the Barbers. 451 U.S. at 193. A white woman, whose daughter lived with Rosales-Lopez, was a witness at trial. The Supreme Court in Rosales-Lopez, however, did not address the necessity of a voir dire question about interracial or interethnic marriage and sexual relations where both participants were codefendants. First, the daughter of the white woman, who lived with Rosales-Lopez, was not a codefendant. Second, no such question was requested on behalf of Rosales-Lopez, nor were any arguments made as to the cohabitation prejudice in the lower courts. Third, the Court's holding addressed whether the testimony by the mother of the white woman raised a reasonable possibility that the jury's determination was influenced by prejudice. The Court held that her testimony had not created a reasonable possibility of prejudice because it had been "substantially cor-

17

Prior to the Supreme Court's decision in Rosales-Lopez, we found reversible error in this Circuit when the trial judge refused to ask a question on racial or ethnic prejudice requested by a defendant who was a member of a minority group. Rosales-Lopez , 451 U.S. at 187; see, e.g., United States v. Gore, 435 F.3d 1110 (4th Cir. 1970). Shortly after the Supreme Court handed down Rosales-Lopez, we had the opportunity to apply the Supreme Court's reasoning in a case where a black defendant appealed the district judge's failure to ask on voir dire two requested questions regarding racial prejudice. United States v. Brown, 767 F.2d 1078 (4th Cir. 1985). The first question requested by the defendant asked about membership in discriminatory organizations, such as the Ku Klux Klan, and the second asked about objective and subjective feelings of racial prejudice. The trial judge refused to ask those questions and instead made a general inquiry into racial prejudice and bias including:

> As you may observe, the defendant in this case--he is seated at counsel table--is a member of the black race. If any person has any feeling they would have any difficulty in rendering a fair and impartial trial, giving due weight to all of the evidence and testimony in the case, because the defendant or a witness is a member of the black or white race, then they should tell the Court at this time so that they may be excused from service.

Id. at 1082. Applying Rosales-Lopez, we affirmed the district court's refusal to ask more specific questions, changing our standard to hold that where a defendant requests a voir dire question on racial prejudice if "sufficient questions are asked on voir dire to disclose possible racial bias against the defendant, although asked in general terms," nothing more is required, "except where circumstances of the case

_____

roborated by the other witnesses presented by the Government." Id. Finally, cohabitation between a Mexican-American and a white does not have the same history of deep-seated prejudice that marriage between a black and a white has in this country. Thus, the holding in Rosales-Lopez regarding the testimony of a white woman whose daughter lived with the petitioner Rosales-Lopez is inapposite to the Barbers' circumstances.

18

indicate a reasonable possibility that racial prejudice may have influenced the jury." Id. at 1081.**11**

Here, no general "proxy" question was given to ferret out any potential bias against marriage between blacks and whites, despite several external circumstances that strongly suggest a reasonable possibility for prejudice among the jury pool.**12** Those facts, in brief, are as follows. The Barbers are a married couple. Norwood Barber is black and Linda Barber is white. As codefendants they sat at counsel

_____

**11** In other cases where there is a possibility of similar prejudice, but which is not racial in character, it is an abuse of discretion not to ask a question directed at that bias. For example, when a trial will turn on the resolution of conflicting testimony between a police officer and a defendant, we have recognized an inherent possibility of juror bias in favor of the officer and, therefore, require the trial court to question the jurors on whether they are more likely to believe a police officer than a witness. Rainey v. Conerly, 973 F.2d 321, 325 (4th Cir. 1992); United States v. Evans, 917 F.2d 800, 806-09 (4th Cir. 1990). But cf. United States v. Lancaster, No. 95-5012 (4th Cir. March 20, 1996). To refuse to ask such a question denies the defendant "the benefit of a voir dire that will provide essential information so as to allow the intelligent exercise of jury challenges," whether for cause or peremptory. Rainey, 973 F.2d at 325 (quoting Evans, 917 F.2d at 809). But cf. Lancaster, No. 95-5012 (4th Cir. March 20, 1996).

**12** The district judge made no general or specific inquiry about racial prejudice; he made only the following general inquiries:

> Do you know of any reason why you cannot hear the facts of this case fairly and impartially and render a just verdict?

> If you are selected to sit on this jury, aside from those who have indicated problems, will you be able to render a verdict solely on the evidence presented at this trial, testimony from the witness stand, the exhibits and in the context of the law as I will give it to you in my instructions, disregarding any other ideas, notions or beliefs about the law that you may have encountered in reaching your verdict?

> Now, having heard the questions put to you by the court, does any other reason suggest itself to you as to why you could not sit on this jury and render that fair and impartial verdict based on the evidence presented in the context of the court's instructions to you on the law?

19

table and were, thus, visible to the entire jury. The Barbers lived and were tried in a State that made their marriage a felony punished by one to five years in jail until the Supreme Court held that it could no longer do so in 1967. The Supreme Court's decision, however, did not effect an immediate change in attitudes in Virginia where there is a long and complex history of social, sexual, and legal taboos against marriage between blacks and whites. Many individuals continue to maintain residual prejudice from a bygone era. Polling demonstrates a persevering prejudice left over from the social attitudes that supported antimiscegenation laws. The majority ignores those facts and the actuality of substantial prejudice against marriage between blacks and whites.[13]

The Supreme Court has held that where a defendant is accused of a violent crime and where the defendant and the victim are members of different racial or ethnic groups, a reasonable possibility of racial prejudice exists. Rosales-Lopez, 451 U.S. at 192. Similarly, here, where the Barbers as codefendants are participants in an interracial marriage that violates deep-seated sexual, social, and until recently legal, taboos, there is a reasonable possibility of prejudice against the Barbers. I therefore feel that it was reversible error not to ask any sort of "proxy" question on voir dire specifically aimed at uncovering prejudice toward marriage between blacks and whites. The question need not have been phrased precisely as the Barbers requested, but it must have gone to the potential for prejudice against mixed-race marriages.

In order "to perform its high function in the best way `justice must satisfy the appearance of justice.'" Swain , 380 U.S. at 219 (citing In re Murchison, 349 U.S. 133, 136 (1955)). If a question about negative

_____

[13] The Barbers' situation is quite different from one where the only possibility of prejudice is suggested by the defendant being of a different race or ethnicity than the juror. See, e.g., United States v. Brooks, 957 F.2d 1138 (4th Cir.), cert. denied, 505 U.S. 1228 (1992). It was not a codified crime in Virginia in 1967 to be of a different race, i.e. a black. The Barbers' requested question was directed principally at the interracial aspect of their marriage. It was that aspect, rather than the fact that one was black, which led them to request a voir dire question on attitudes toward interracial marriage.

20

feelings or attitudes about miscegenous marriages had been asked and answered in a manner demonstrating prejudice against marriage between blacks and whites, the trial judge more than likely would have excused the potential juror for cause. If he had not, the Barbers would have had the opportunity to exercise a peremptory strike on that juror. Not to ask that question and, therefore, to allow jurors who potentially harbored bias against the Barbers to sit and judge them created the risk of a biased jury and partial justice.

Understandably, trial judges are reluctant to make inquiries into racial or ethnic bias in every case for fear of creating the impression "that justice in a court of law may turn upon the pigmentation of skin [or] the accident of birth." Rosales-Lopez, 451 U.S. at 190 (citing Ristaino, 424 U.S. at 596 n.8.) "[A]voiding the inquiry," however, "does not eliminate the problem, and . . . [the] trial is not the place in which to elevate appearance over reality." Id. at 191. Ignoring the reality of a reasonable possibility of prejudice against marriage between blacks and whites results in the possibility of precisely the appearance we seek to avoid--justice turning on the pigmentation of skin--that of Linda and Norwood Barber--black and white.

Judge Ervin, Judge Michael, and Judge Motz join in this dissent.

21