**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

CHRISTOPHER C. GOINS,
Petitioner-Appellant,

v.

RONALD ANGELONE, Director,
Virginia Department of Corrections,
Respondent-Appellee.

No. 99-13

Appeal from the United States District Court
for the Eastern District of Virginia, at Alexandria.
T. S. Ellis, III, District Judge.
(CA-97-1406-A)

Argued: June 6, 2000

Decided: August 31, 2000

Before LUTTIG, TRAXLER, and KING, Circuit Judges.

_____

Certificate of appealability denied and appeal dismissed by published
opinion. Judge King wrote the opinion, in which Judge Luttig and
Judge Traxler joined.

_____

**COUNSEL**

**ARGUED:** Frank Salvato, Alexandria, Virginia, for Appellant. Katherine P. Baldwin, Assistant Attorney General, OFFICE OF THE
ATTORNEY GENERAL, Richmond, Virginia, for Appellee. **ON
BRIEF:** Robert E. Lee, Jr., VIRGINIA CAPITAL REPRESENTATION RESOURCE CENTER, Richmond, Virginia; Robert S. Powell,

Arlington, Virginia, for Appellant. Mark J. Earley, Attorney General of Virginia, OFFICE OF THE ATTORNEY GENERAL, Richmond, Virginia, for Appellee.

_____

**OPINION**

KING, Circuit Judge:

Appellant Christopher C. Goins, convicted and sentenced to death by a Virginia jury for the capital murder of Robert Jones, appeals the district court's dismissal of his petition for a writ of habeas corpus. Finding no error, we deny a certificate of appealability and dismiss the appeal.

I.

A.

The facts underlying the murder charges against Goins were set forth in some detail by the Supreme Court of Virginia in its decision on Goins's direct appeal, Goins v. Commonwealth , 470 S.E.2d 114 (Va. 1996), and are quoted below.

> On the morning of October 14, 1994, Goins and his friend Barry Scott arrived at the home of Tamika Jones, where Tamika and the six other members of her family were present. Both Goins and Scott were friends of the Jones family.
>
> Tamika, who was 14 years old, was seven months pregnant with Goins' child and recently had returned from the hospital after receiving treatment for complications related to the pregnancy. When Scott attempted to show Goins an ultrasound photograph of the fetus, Goins refused to look and became angry.
>
> Tamika saw Goins in the living room, but was in her bedroom when she later heard him participating in a conversation in the kitchen. The conversation was interrupted by the

2

sound of gunfire. The shots were fired rapidly and were followed by screams, crying, and the sound of a single set of footsteps in the hall. Tamika stated that she then heard more shots and saw "flashes in the hall."

Goins appeared in the doorway of Tamika's bedroom and shot her nine times. He also shot her 21-month-old sister, Kenya, whom Tamika had attempted to shield with her body.

When Tamika believed that Goins had left the apartment, she telephoned "911" for emergency assistance. She told the operator that Goins had shot her. The operator asked if anyone was with her. Tamika responded, "Yes. He shot them too."

When the City of Richmond police arrived at the Jones' home, they determined that all the members of the Jones family had been shot. Only Tamika and Kenya survived. In the kitchen, the police found the body of Tamika's four-year-old brother, David, as well as the bodies of her parents, Daphne Jones and James Randolph, Jr. In one of the bedrooms, the police found the bodies of Nicole Jones, Tamika's nine-year-old sister, and Robert Jones, Tamika's three-year-old brother.

Daphne Jones was shot four times, twice in the head, once in the left wrist, and once in the right leg. Both of the gunshot wounds to her head were lethal. One of these wounds showed evidence of "stippling," consisting of burned and unburned gun powder, which indicated that the gun was fired within a few feet of her head.

James Randolph, Jr. was shot nine times, twice in the head, three times in the left arm and chest, once in the abdomen, once in the right arm, once in the left leg, and once on the chin. Four of these wounds were lethal. The evidence showed that some of the shots were fired from less than "arm's length" and other shots were fired after Randolph had fallen to the ground.

3

David died as a result of a lethal gunshot wound to the head. This wound also showed evidence of stippling. Nicole suffered two lethal gunshot wounds. One bullet passed through her heart and a lung. The other bullet was fired into her head at close range. Robert sustained two lethal gunshot wounds to his head. Kenya sustained a wound, measuring between two and three inches long, through her left wrist.

Tamika was shot three times in the abdomen, three times in her thighs, once in her right hand, once in the neck, and once in her left shoulder. Her obstetrician performed a hysterectomy on her after the shootings, because multiple bullets had perforated her uterus and her right ovary and fallopian tube. When removed from the uterus, the fetus had sustained a gunshot wound to its face and was dead.

The police retrieved from the kitchen seven .45 caliber cartridge casings, various bullets, and bullet jacket fragments. In the bedroom where Nicole and Robert were shot, the police found two .45 caliber cartridge casings, as well as two bullets, a bullet jacket, and a lead fragment. In the bedroom where Tamika and Kenya had been shot, the police recovered six .45 caliber cartridge casings and two bullets. No weapon was found.

James L. Pickelman, a firearms identification expert at the Commonwealth's Division of Forensic Science, explained that hollow point bullets, such as those used in the commission of these offenses, are designed by the manufacturer to explode on impact with the target. Frequently, at the point of impact, the bullet core separates from its jacket. Pickelman examined the weight and rifling characteristics of the bullets, bullet jackets, and jacket fragments recovered from the apartment and the victims' bodies. He testified that all these items were ".45 auto caliber."

After examining the rifling marks on the bullet jackets and jacket fragments retrieved from Jones' apartment, Pickelman concluded that the bullet jackets were ejected from a firearm constructed by a manufacturer who uses polygonal

4

rifling. Pickelman also stated that Glock, Inc. is the major manufacturer which uses this type rifling in the design of its firearms.

Ann D. Jones, also an expert in firearms identification at the Division of Forensic Science, compared the various microscopic markings on each cartridge casing that was recovered. Her examination of these markings established that all the cartridge casings were fired from the same .45 caliber Glock pistol. Jones stated that .45 caliber Glock pistols produce an elliptical shape firing pin impression, which is unique to that brand and type of pistol. She observed this impression on all the cartridge casings recovered from the crime scene.

Jones also testified that she compared the markings on one of the cartridge casings found at the crime scene with the markings on the unfired .45 caliber cartridge found in the home of Monique Littlejohn, Goins' girlfriend. Jones observed that these items exhibited the same extractor marks and concluded that both items had been in the same weapon.

On two occasions, the police searched Littlejohn's apartment. In addition to the unfired .45 caliber cartridge, they found an instruction manual for Glock pistols lying on the floor near some men's clothing.

In Littlejohn's automobile, the police found a Sam's Club identification card. Although Goins' photograph appeared on the card, the card was issued in the name of Derrick Reardon. Two other identification cards were also found in Littlejohn's car. Both cards were issued in the name of Derrick Reardon, but displayed Goins' picture. Investigators also found a high school equivalency diploma issued in the name of Derrick Lydell Reardon in Littlejohn's vehicle, as well as the business card of a taxicab driver, Parrish Davis.

Approximately one month after the shootings, Goins was apprehended in New York with Monique Littlejohn. At the time of his arrest, Goins had shaved his head.

5

Parrish Davis, who had known Goins for several months prior to the shootings, testified that Goins had been a passenger in his taxicab approximately once or twice each week during those months. Davis stated that, during this time, Goins was living with Littlejohn at her apartment.

Davis also stated that about one week before the shootings, he had a conversation with Goins, in which Goins stated that he was upset because Tamika was pregnant by him. Goins told Davis that "he wanted to do away with her and her family." At that time, Davis did not believe that Goins intended to harm the Jones family. However, Davis stated that he and Goins occasionally discussed the subject of .45 caliber pistols.

Davis also testified that he spoke with Goins on the evening of October 14, 1994, after the shootings. During that conversation, Goins asked Davis to drive him out of town in the trunk of a friend's car. Davis refused to do so.

After the Commonwealth rested its case, Goins presented testimony from two witnesses. Mildred S. Plumber, an employee of the taxicab company for which Davis worked, testified that company records for October 1994 indicated Davis had reported no fares for service to or from the address at which Littlejohn and Goins lived. However, Plumber conceded that Davis might have provided service to that location and not have reported the fares to the company.

Goins also offered the testimony of Jason Lamont Williams, who stated that, during the week before the killings, he "might have" ridden with Goins in a taxicab driven by Davis. Williams stated that Goins never said anything in his presence about guns or about "doing away" with Tamika Jones or her family. On cross-examination, the Commonwealth's attorney asked Williams, "Do you or have you in the past sold drugs for Mr. Goins?" The trial court sustained Goins' objection to the question. The Commonwealth's attorney then asked, "Sir, have you ever told your probation

6

officer, Ms. Bircham, that you sold drugs for this defendant?" Once again, the trial court sustained Goins' objection to the question. Finally, the trial court permitted the Commonwealth's attorney to ask Williams, "Did you ever tell your probation officer, Ms. Bircham, that you had a business relationship with Mr. Goins?" Williams responded,"No."

During the penalty phase of the trial, the Commonwealth offered testimony from Detective John J. Riani of the Henrico County Police Department, who testified that, in February 1994, he had encountered Goins while working as a narcotics investigator at the Amtrack station on Staples Mill Road. Goins had alighted from a train arriving from New York when Riani approached and asked him some questions. When Goins later consented to a search of his bags and clothing, Riani found 55.35 grams of crack cocaine in a bag inside Goins' coat pocket. This amount of cocaine had a "street value" of approximately $5,500.

Riani then arrested Goins for possession of cocaine with intent to distribute. Goins told Riani that he was addicted to crack cocaine.

Goins never appeared for trial and a capias was issued for his arrest. Both the cocaine charge and the capias remained outstanding at the time of the present offenses.

The Commonwealth also presented evidence from Dr. Jack Daniel, Assistant Chief Medical Examiner for the Commonwealth. Dr. Daniel testified that James Randolph, Jr., Nicole Jones, and Robert Jones all suffered multiple lethal gunshot wounds. He also testified that one of Nicole's lethal wounds occurred while she was lying face down. In addition, Dr. Daniel stated that the dried blood on Robert's face indicated that Robert had not moved after he was shot the first time.

In mitigation of the offenses, Goins presented the testimony of Paulette Goins Dickerson, his mother's sister. Dickerson testified that Goins' mother had used drugs fre-

quently in front of Goins. Dickerson also testified that Goins has an aunt who abuses drugs, and that another of his aunts died of AIDS acquired from drug use. Dickerson further related that Goins has an uncle who is incarcerated in New York. Another uncle is mentally handicapped, as a result of a head injury sustained at age two when Goins' mother pushed him out of a third-story window.

Dickerson also testified that, when Goins was 12 years old, he moved from Richmond to New York to live with his grandmother because his mother had abused him. Dickerson stated that Goins' mother never held, hugged, or nurtured any of her children. According to Dickerson, Goins was devastated when his grandmother died, because she was the only person who had shown him any love.

Goins' cousin, Leah Butler, testified that she had lived briefly in the same household with Goins and had observed his mother use drugs and neglect her children. Butler also testified that Goins is a caring, "giving" man. Butler's son, Phillip, age six, testified that he liked Goins, and that Goins would often play games with him and bring him candy.

Goins, 470 S.E.2d at 119-122.

B.

On June 13, 1995, a jury in the Circuit Court of the City of Richmond convicted Goins on one count of capital murder for the killing of Robert Jones, four counts of first degree murder, two charges of malicious wounding, and seven counts of illegal use of a firearm. At the conclusion of the separate sentencing proceeding, the jury found both statutory aggravating factors to be present: (1) that Goins's conduct was "outrageously or wantonly vile, horrible, or inhuman;" and (2) that he represented "a continuing serious threat to society." Va. Code § 19.2-264.2.[1] Based on these findings, the jury fixed Goins's

_____

[1] Virginia's capital punishment statute involves a two-step determination by the jury in the sentencing phase of the trial. If the defendant has

8

punishment at death for the capital murder of Robert Jones. For the noncapital offenses, the jury sentenced Goins to four life terms plus seventy-eight years in prison. After considering the probation officer's report and conducting a sentencing hearing, the trial court imposed the death penalty, in accordance with the jury's verdicts.**2**

Goins appealed his convictions and sentences to the Supreme Court of Virginia, which affirmed by published opinion issued on April 19, 1996. See Goins, 470 S.E.2d at 132. The Supreme Court, on October 7, 1996, denied Goins's petition for a writ of certiorari. See Goins v. Virginia, 519 U.S. 887 (1996).

On December 6, 1996, Goins, through newly appointed counsel, filed a petition for a writ of habeas corpus in the Supreme Court of Virginia. On December 26, 1996, Goins filed an amended petition to comply with a fifty-page limit established by state rules. See Va. Sup. Ct. R. 5:7(h). On May 5, 1997, the Supreme Court of Virginia dismissed Goins's amended petition. See Goins v. Warden, No. 962477 (Va. 1997).

Thereafter, on August 14, 1997, the Circuit Court scheduled Goins's execution for September 15, 1997. However, on September 5, 1997, Goins filed a motion in the Eastern District of Virginia seeking a stay of execution and appointment of counsel to prepare a federal habeas corpus petition. On September 11, 1997, the district court stayed Goins's execution and granted his motion for appointment of counsel. On January 7, 1998, Goins filed a motion seeking the

_____

been found guilty in the trial's guilt phase, the jury must decide, in the sentencing phase, whether the prosecution has established one or both of the statutory aggravating factors. Va. Code Ann.§ 19.2-264.4(C)-(D) (1995). If the jury finds neither aggravating factor satisfied, it must impose a sentence of life imprisonment. Id. However, if the jury finds one or both of the aggravating factors established, it has full discretion to impose either a death sentence or a sentence of life imprisonment. Id.

**2** "Under Virginia's statutory capital sentencing scheme, it is the jury's responsibility to `fix' the punishment of a defendant who has been convicted of a capital offense and it is the court's responsibility to impose sentence." Frye v. Commonwealth, 345 S.E.2d 267, 286 (Va. 1986).

9

appointment of experts and an investigator, which the district court denied without prejudice. On February 17, 1998, Goins filed his application for a writ of habeas corpus in the district court, asserting thirty-six separate grounds for relief. In a published opinion, the district court rejected these claims and denied habeas corpus relief. See Goins v. Angelone, 52 F. Supp. 2d 638 (E.D. Va. 1999). By order of August 24, 1999, the district court denied Goin's application for a certificate of appealability.

II.

On appeal, Goins contends that the district court erred in dismissing his petition for habeas corpus relief, asserting that: (1) errors in the jury selection process during the guilt phase of his murder trial violated his rights under the Sixth and Fourteenth Amendments; (2) the prosecution failed to produce results of a polygraph examination in violation of Brady v. Maryland, 373 U.S. 83 (1963); (3) evidence of his parole eligibility was erroneously excluded; (4) the performance of his counsel at trial and on direct appeal was constitutionally defective; (5) he was impermissibly excluded from critical stages of his trial; and (6) the district court erred in denying his motions for discovery and an evidentiary hearing.

Each of these assertions was thoroughly considered and resolved by the district court. After careful consideration of the record, the applicable legal principles, and the arguments and briefs, we find the district court's analysis to be well-reasoned and persuasive. See Goins, 52 F. Supp. 2d at 648-81. As further explained below, we therefore deny a certificate of appealability and dismiss Goins's appeal.

III.

Pursuant to the standards prescribed by Congress at 28 U.S.C. § 2254 (1994 & Supp. III 1997), as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214, a federal court may not grant a writ of habeas corpus with respect to a claim adjudicated on the merits in state court proceedings unless the state's adjudication: (1) "resulted in a decision that was contrary to, or involved an unreasonable application of,

clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1); or (2) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Id. § 2254(d)(2). A state court adjudication is "contrary to" clearly established federal law if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." Williams v. Taylor, 120 S. Ct. 1495, 1523 (2000). A state court decision unreasonably applies clearly established federal law if the state court, despite correctly identifying the governing legal principle, "unreasonably applies that principle to the facts of the prisoner's case." Id.

IV.

A.

During the jury selection proceedings of Goins's murder trial, Goins's counsel requested that the trial court voir dire potential jurors on a number of topics, including two race-related inquiries: (1) "Have you ever experienced fear of a person of another race? If so, what were the circumstances?" and (2) "Do you think that African-Americans are more likely to commit crimes than whites? If so, why?" The trial court declined to ask either of these voir dire questions. On direct appeal, Goins contended that "the trial court erred in refusing to ask these questions because they were relevant to establishing relationship, interest, opinion, or prejudice." 470 S.E.2d at 124-25. However, the Supreme Court of Virginia rejected this contention on the merits, concluding that the trial court did not abuse its discretion in refusing to allow Goins to ask the race-related questions. Finding that the questions permitted during voir dire were sufficient to preserve Goins's right to a fair and impartial jury, the Supreme Court of Virginia held that the trial court's "refusal to ask [the additional] questions during voir dire did not violate Goins' rights under the Sixth, Eighth, and Fourteenth Amendments of the United States Constitution." Id. at 125. This adjudication on the merits may not be overturned on federal habeas review unless the state court's determination "was contrary to, or involved an unreasonable application of,

11

clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d). **3**

B.

1.

The Sixth and Fourteenth Amendments guarantee a criminal defendant the right to a trial by an impartial jury. Turner v. Murray, 476 U.S. 28, 36 n.9 (1986). A principal mechanism used to safeguard this right is the voir dire of prospective jurors. Indeed, voir dire "plays a critical function in assuring the criminal defendant that his Sixth Amendment right to an impartial jury will be honored." Rosales-Lopez v. United States, 451 U.S. 182, 188 (1981) (plurality opinion). Voir dire "serves the dual purpose" of (1) identifying those individuals in the venire who are incapable of following the court's instructions and evaluating the evidence, and (2) assisting lawyers in the exercise of peremptory strikes. Mu'Min v. Virginia, 500 U.S. 415, 431 (1991).

Because the adequacy of voir dire frequently turns on the trial judge's evaluation of the responses and demeanor of prospective jurors, the conduct of voir dire "must be committed to the good judgment of the trial judge whose `immediate perceptions' determine what questions are appropriate for ferreting out relevant prejudices." United States v. Barber, 80 F.3d 964, 967 (4th Cir. 1996) (en banc) (citing Rosales-Lopez, 451 U.S. at 189). As the plurality in Rosales-Lopez observed:

> The trial judge's function as this point in the trial is not unlike that of the jurors later on in the trial. Both must reach

_____

**3** Pursuant to Hawks v. Cox, 175 S.E.2d 271, 274 (Va. 1970), which established that state habeas review is not available for claims raised and decided against petitioner on direct review, the Supreme Court of Virginia dismissed Goins's state habeas claims asserting constitutional error in the jury selection process of his capital murder trial. See Goins v. Warden, No. 962477 (Va. May 5, 1997). The rule articulated in Hawks does not however, prevent federal habeas review of otherwise properly raised claims. See Correll v. Thompson, 63 F.3d 1279, 1289 n.8 (4th Cir. 1995).

12

conclusions as to impartiality and credibility by relying on their own evaluations of demeanor evidence and of responses to questions. In neither instance can an appellate court easily second-guess the conclusions of the decision-maker who heard and observed the witnesses.

451 U.S. at 188. For these reasons, trial courts "retain[ ] great latitude in deciding what questions should be asked on voir dire." Mu'Min, 500 U.S. at 424; see also Ham v. South Carolina , 409 U.S. 524, 528 (1973) (recognizing "the traditionally broad discretion accorded to the trial judge in conducting voir dire . . . .") (citation omitted).

2.

Despite this broad discretion, trial courts are constitutionally required, under certain circumstances, to allow a criminal defendant to voir dire potential jurors concerning racial or ethnic bias. Indeed, "some cases may present circumstances in which an impermissible threat to the fair trial guaranteed by due process is posed by a trial court's refusal to question prospective jurors specifically about racial prejudice during Voir dire." Ristaino v. Ross , 424 U.S. 589, 595 (1976). Thus, when "special circumstances" indicate that racial issues are "inextricably bound up with the conduct of the trial," an accused's constitutional right to a trial by an impartial jury prohibits a trial court from refusing a request for voir dire directed to racial prejudice. Id. at 597. The critical inquiry is whether the circumstances in a given case demonstrate a "constitutionally significant likelihood that, absent questioning about racial prejudice, the jurors would not be as `indifferent as (they stand) unsworne.'" Ristaino , 424 U.S. at 596 (citation omitted).

A review of the Supreme Court's decisions in this regard is instructive. In Ristaino, supra, the Supreme Court described the "special circumstances" under which a trial court is constitutionally required to permit voir dire relating to racial bias. The Ristaino Court contrasted the facts of that case with those in Ham, supra, where the Court reversed the defendant's conviction based on the state trial court's failure to honor such a request. In Ham, an African-American defendant was charged with possession of marijuana, and his defense was based on his assertion that law enforcement officers had "framed" him

13

in retaliation for his active and widely known participation in local civil rights activities. Under those facts, the Court held that "special circumstances" existed such that the defendant was constitutionally entitled to explore the racial attitudes of the venire. 409 U.S. at 527. By contrast, in Ristaino, an African-American defendant was charged with a violent crime against a Caucasian victim. The Court in Ristaino concluded that those facts did not create a similar need of "constitutional dimensions" to inquire into the racial prejudices of potential jurors. 424 U.S. at 597.

The critical factor present in Ham, but not present in Ristaino, was that the racial issues in Ham were "inextricably bound up with the conduct of the trial." Id. As a result, voir dire inquiries specifically directed to the potential racial biases of prospective jurors were necessary to assure an impartial jury in that case. Id. Conversely, the black-on-white crime alleged in Ristaino, standing alone, did not suggest a "significant likelihood that racial prejudice might infect [the defendant's] trial." Id. at 598.

A third Supreme Court decision also informs our analysis. In Turner, 476 U.S. at 36-37, an interracial crime formed the basis of a capital prosecution. The Supreme Court distinguished Ristaino and concluded that the trial court was constitutionally required to permit voir dire into the possible racial prejudices of the venire. The Court recognized that capital sentencing proceedings require jurors to make a "highly subjective, unique, individualized judgment regarding the punishment that a particular person deserves." Id. at 33-34 (citations and internal quotations omitted). As a result of"the range of discretion entrusted to a jury in a capital sentencing hearing, there is a unique opportunity for racial prejudice to operate but remain undetected." Id. at 35. Moreover, the Court found that the absolute finality of the death penalty renders the danger of racial bias infecting a capital sentencing proceeding especially serious. Id. Given the danger of racial prejudice infecting a capital sentencing proceeding, coupled with the underlying interracial crime, the Court concluded that "special circumstances" existed to implicate the defendant's constitutional rights: "[A] capital defendant accused of an interracial crime is entitled to have prospective jurors informed of the race of the victim and questioned on the issue of racial bias." Id. at 36-37.

14

C.

Asserting that such "special circumstances" existed during his murder trial, Goins contends that racial issues were"inextricably bound up with the conduct of the trial." Goins's argument in this regard is based principally on the fact that he was tried by a predominantly white jury from rural Gloucester County, Virginia. **4** That is, Goins asserts that racial issues were "inextricably bound up" with his murder trial because the proceedings involved an African-American defendant and a predominantly white jury. As Goins's trial counsel argued during jury selection,

> Race actually is an issue in this case; and that is-- that's because we have the -- while we have an African American defendant and African American victims, we have a number of white jurors. And if they feel that blacks are more violent in nature, then they're liable to look at the defendant and assume, yes; he is a more violent person . . . .[Moreover,] [i]f people have attitudes about African Americans that are

_____

**4** The venire was selected from Gloucester County as a result of the trial court's decision to grant Goins's motion for change of venue. Despite having moved for the change of venue, Goins asserted in his state habeas petition that the trial court's decision to select the venire from Gloucester County denied him the right to an impartial jury and a fair trial. The Supreme Court of Virginia found this claim to be procedurally defaulted under the rule of Slayton v. Parrigan, 205 S.E.2d 680, 682 (Va. 1974), which prohibits state habeas review of claims that were available to petitioner at trial or on direct appeal and that petitioner failed to raise at that time.

Because the rule of Slayton qualifies as an independent and adequate state procedural rule for the purposes of federal habeas procedural default analysis, see, e.g., Fisher v. Angelone, 163 F.3d 835, 844 (4th Cir. 1998), federal review of this defaulted claim is barred unless Goins can show that: (1) there is cause for, and actual prejudice from, the default; or (2) the failure to review the claim would result in a fundamental miscarriage of justice. Coleman v. Thompson , 501 U.S. 722, 750 (1991). Because Goins cannot make either showing, the district court properly concluded that "there is no obligation here to consider the application of either exception to the procedural default rule." Goins, 52 F. Supp. 2d at 650.

15

based on racial prejudice, then they're more likely to render a more severe punishment; i.e., the death penalty, than someone who isn't a racist.

J.A. 24-25.

We must reject this argument. As the district court correctly observed, "[t]here is no constitutional presumption of juror bias for or against members of any particular racial or ethnic group, presumably even when a jury pool is predominantly white." Goins, 52 F. Supp. 2d at 671 (citation and internal quotation omitted). Indeed, the Supreme Court has cautioned trial courts to avoid entertaining the "divisive assumption -- as a per se rule -- that justice in a court of law may turn upon the pigmentation of skin, the accident of birth, or the choice of religion." Ristaino, 424 U.S. at 596 n.8.

Furthermore, the Supreme Court's decision in Turner -- although based largely on the unique responsibilities of jurors in a death penalty case -- is of little assistance to Goins. Turner was based on the confluence of three separate, but equally critical, factors: (1) the broad discretion given to capital sentencing jurors; (2) the serious risk of improper sentencing in a capital case; and (3) the charged offense involved interracial violence. 476 U.S. at 37. The crucial factor absent from this case, of course, is an underlying interracial crime. As the district court aptly noted,

> [Turner] has no application here, as both Goins and the victims were African-American. Moreover, no Supreme Court or Fourth Circuit decision has held that capital defendants accused of crimes against victims of their own race have a right to question prospective jurors on the issue of racial bias.

Goins, 52 F. Supp. 2d at 671.

Put simply, Goins's presumptions as to the racial attitudes of the jurors fail to demonstrate a "significant likelihood" that racial prejudice influenced their deliberations. None of the charges against Goins -- one count of capital murder, four counts of first degree murder,

16

two counts of malicious wounding, and seven counts of illegal use of a firearm -- involved any element relating to race. See Barber, 80 F.3d at 968 (recognizing that racial issues may become "inextricably bound up" with the trial when "race is an issue to be tried either as an element of the offense or a defense or where racial issues are connected with the resolution of relevant facts"). Likewise, race was not an element of any legitimate defense advanced by Goins. See id. Furthermore, none of the evidence adduced during the guilt phase of Goins's murder trial suggested race as an issue in the case. See id. Indeed, race became an issue only when Goins sought to explore the racial attitudes of prospective jurors. On this basis alone, we cannot conclude that racial issues were "inextricably bound up with the conduct of the trial."[5] The racial makeup of the jury panel, even when coupled with the capital charge at issue, "did not create a need of `constitutional dimensions' to question the jury concerning racial prejudice." Rosales-Lopez, 451 U.S. at 190. Accordingly, the state trial court was not constitutionally required to ask the questions requested by Goins.

Of course, we agree that "the wiser course generally is to propound appropriate questions designed to identify racial prejudice if requested by the defendant." Ristaino, 424 U.S. at 597 n.9. Indeed, the Supreme Court, pursuant to its supervisory authority over the federal courts, has required the district courts to permit voir dire directed to the discovery of racial bias under circumstances in which such an inquiry would not be constitutionally required. Id. Under this "nonconstitutional" standard, a plurality of the Supreme Court in Rosales-Lopez stated that a federal district court's "[f]ailure to honor [a defendant's] request [to examine the racial prejudices of potential jurors] . . . will be reversible error only where the circumstances of the case indicate

_____

5 Additionally, Goins contends he was entitled to voir dire jurors regarding racial bias because some jurors had given false answers during voir dire in an attempt to be excluded from serving on the jury. However, as the district court recognized, "there is no evidence or offer of evidence that any jurors gave false answers to disguise racial prejudice, and thus the allegation that jurors were lying does not suggest that racial issues were `inextricably bound up in the trial.'" Goins, 52 F. Supp. 2d at 671-72.

17

that there is a reasonable probability that racial or ethnic prejudice might have influenced the jury." 451 U.S. at 191. **6**

A trial court in the Commonwealth of Virginia, however, is not bound by this "nonconstitutional" standard. As the Supreme Court recently observed in Dickerson v. United States , 2000 WL 807223 (June 26, 2000), "With respect to proceedings in state courts, our `authority is limited to enforcing the commands of the United States Constitution.'" Id. at *7 (quoting Mu'Min, 500 U.S. at 422); see also Harris v. Rivera, 454 U.S. 339, 344-345 (per curiam) ("Federal judges have no general supervisory power over state trial judges; they may not require the observance of any special procedures except when necessary to assure compliance with the dictates of the Federal Constitution."). Moreover, a federal habeas court's review is "limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." Estelle v. McGuire, 502 U.S. 62, 68 (1991). Therefore, in the absence of "special circumstances" that trigger an accused's constitutional right to inquire into racial prejudice, the "conduct of voir dire [is left] to the sound discretion of state trial judges," Turner, 476 U.S. at 38 n.12 (1986), in which case a "generalized but thorough inquiry into the impartiality of the veniremen" will be constitutionally sufficient. Ristaino, 424 U.S. at 598.

As noted, federal habeas corpus relief is available only where a petitioner demonstrates that state court proceedings resulted in a decision that was "contrary to, or involved an unreasonable application of clearly established Federal law" or was based on an unreasonable determination of the facts. 28 U.S.C. § 2254(d). With respect to his voir dire claim, Goins has failed to establish the existence of "special circumstances" indicating that racial issues were "inextricably bound up in the trial." Accordingly, Goins was not constitutionally entitled

_____

**6** The circumstances necessary to implicate the "nonconstitutional" standard differ in degree from those necessary to trigger the constitutional standard. To prompt the application of the constitutional standard, the facts must demonstrate a "significant likelihood" that racial bias might infect the proceedings. Ristaino, 424 U.S. at 598. By contrast, to implicate the "nonconstitutional" standard in federal courts, a defendant need demonstrate only a "reasonable possibility" that racial prejudice might influence the jury. Rosales-Lopez, 451 U.S. at 191.

to ask prospective jurors the specific questions requested. In this regard then, we find that the Supreme Court of Virginia correctly rejected this claim and, by definition, its conclusion was not "unreasonable" in the Williams sense. See Tucker v. Catoe, Nos. 99-14, 99-15, 2000 WL 763597, *15 (4th Cir. June 13, 2000). Goins's claim in this regard therefore fails.

V.

Goins also asserts other bases for his claim to federal habeas corpus relief, which we discuss below.

A.

First, Goins contends that the trial court failed to fulfill its obligation to select a fair and impartial jury by refusing to allow him to conduct voir dire of the jurors individually. After initially questioning jurors in groups of three and five, the trial court decided to conduct the remainder of voir dire in groups of thirteen. Goins maintains that individual voir dire was necessary -- particularly in light of extensive pretrial publicity -- to preserve his constitutional right to a fair and impartial jury.

We reject this argument. As we observed in United States v. Bakker, 925 F.2d 728, 734 (4th Cir. 1991), it "is well established that a trial judge may question prospective jurors collectively rather than individually." Of course, in federal court, if the district judge determines that a member of the venire has been exposed to prejudicial pretrial publicity, that juror "must then be examined, individually and outside the presence of the other jurors, to determine the effect of the publicity." United States v. Hankish, 502 F.2d 71, 77 (4th Cir. 1974) (quoting Margoles v. United States, 407 F.2d 727, 735 (7th Cir. 1969)). As the district court recognized, we have never held that "such safeguards are constitutionally required of state courts, rather than simply observed as a matter of prudent procedure in federal courts." Goins, 52 F. Supp. 2d at 669. Accordingly, the district court correctly concluded that Goins was not entitled to relief on this claim. Id. (citing Teague v. Lane, 489 U.S. 288, 309 (1989) ("[N]ew constitutional rules of criminal procedure will not be applicable to those

19

cases which have become final before the new rules are announced.")).

B.

Next, Goins asserts that the prosecutor's failure to reveal the results of a polygraph examination administered to Barry Scott -- who accompanied Goins to Tamika Jones's apartment on the day of the murders -- violated Brady v. Maryland, 373 U.S. 83 (1963). Under Brady, a prosecutor's failure to disclose "evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87. Evidence is "favorable" if it is exculpatory or if it could be used to impeach prosecution witnesses. See United States v. Ellis, 121 F.3d 908, 914 (4th Cir. 1997) (citation omitted). Evidence is "material" under Brady if "there exists a `reasonable probability' that had the evidence been disclosed the result at trial would have been different." Wood v. Bartholomew, 516 U.S. 1, 5 (1995) (per curiam).

The defense trial theory was that Scott -- rather than Goins -- was the murderer. Goins maintains that Scott failed his polygraph examination and that the results of the examination were therefore exculpatory evidence which should have been disclosed. However, as the district court correctly observed, the record does not reveal whether Barry Scott "in fact failed his polygraph examination or, if he failed, what statements he made were judged to be untruthful." Goins, 52 F. Supp. 2d at 675 n.31. Accordingly, there is simply no basis in the record upon which to conclude that the results of Scott's polygraph examination were "favorable" to Goins.

Moreover, Goins cannot show that the polygraph results were "material" to either his guilt or punishment. Because polygraph results are inadmissible -- even for impeachment purposes-- in Virginia, see e.g., Robinson v. Commonwealth, 341 S.E.2d 159, 167 (Va. 1986), the non-disclosure of Scott's results could not have had any direct impact on the trial. See Wood, 516 U.S. at 6. Therefore, Scott's polygraph results could be "material" -- within the meaning of Brady -- only if their disclosure "would have been `reasonably likely' to result indirectly in a different trial outcome -- for instance, if disclosure would

20

have led trial counsel to conduct additional discovery that would have led to important admissible evidence." Goins , 52 F. Supp. 2d at 675 (citing Wood, 516 U.S. at 6-8). Goins cannot demonstrate any such indirect impact in this case. As the district court aptly stated,

> In this instance, it is unlikely that trial counsel's strategy would have been significantly different had they learned that Scott failed the polygraph examination, if in fact he did. Goins' attorneys had already decided to base their defense on the theory that Scott was the murderer, in reliance on Goins' representations to them that Scott did the killings. Even without the polygraph results, counsel had ample motivation to investigate this theory. It does not appear that the polygraph results would have assisted trial counsel in marshaling their evidence or arguments. Thus, it does not seem that there is any reasonable likelihood that disclosure of the results would have changed the outcome of the trial.

Goins, 52 F. Supp. 2d at 675.

Because the record fails to demonstrate that the prosecutor withheld exculpatory and material evidence, Goins cannot demonstrate that the Virginia Supreme Court's rejection of this claim was contrary to or an unreasonable application of clearly established federal law. See 28 U.S.C. § 2254(d)(1).**7**

C.

Goins also alleges that he had a right to inform the jury during voir dire and during his capital sentencing proceeding of the nature and possibility of parole. These claims have been resolved on the merits on direct appeal, and they are therefore subject to review pursuant to 28 U.S.C. § 2254(d). However, because the Supreme Court of Vir-

---

**7** Goins further argues that results of Scott's polygraph examination should have been admissible as relevant mitigating evidence during his capital sentencing proceeding. As the district court noted, however, "[U]nder current controlling precedent, the Constitution does not mandate admission of polygraph results in capital sentencing proceedings." Goins, 52 F. Supp. 2d at 675.

21

ginia decided these claims without written analysis, the distinction between section 2254(d) "reasonableness" review and de novo review becomes insignificant. See Cardwell v. Greene , 152 F.3d 331, 339 (4th Cir. 1998).

1.

Goins initially argues that the trial court's refusal to allow voir dire regarding the jurors' perceptions of a life sentence deprived him of a fair and impartial jury. Goins's trial counsel sought to voir dire prospective jurors on the meaning of a life sentence in Virginia, namely that if Goins were convicted of a Class 1 felony in Virginia and sentenced to two or more life sentences, he would be eligible for parole only after he served thirty years in prison. See Va. Code § 53.1-151(D). Goins alleges that the trial court's refusal to permit this line of voir dire deprived him of a fair and impartial jury, because "it left him unable to determine which jurors held mistaken impressions regarding the meaning of a life sentence in this case." Goins, 52 F. Supp. 2d at 672. Additionally, Goins asserts that the Due Process Clause of the Fourteenth Amendment required that he be permitted to present evidence regarding the nature of a life sentence during his capital sentencing proceeding.

In Simmons v. South Carolina, 512 U.S. 154 (1994), the Supreme Court held that a capital defendant must be permitted to instruct the jury as to his parole ineligibility in situations where: (1) if sentenced to life imprisonment, he will never become eligible for parole; and (2) the prosecution argues that he presents a future danger. Id. at 171 (emphasis added). Goins contends that the rule in Simmons is equally applicable to his situation -- where if sentenced to a life term, he would not be eligible for parole for thirty years. However, we have repeatedly held that "Simmons does not require that a jury be instructed on the effects of parole for a parole-eligible defendant." Clagett v. Angelone, 209 F.3d 370, 375 n.2 (4th Cir. 2000); see also Wilson v. Greene, 155 F.3d 396, 408 (4th Cir. 1998) (concluding that Simmons does not entitle a capital defendant to an instruction about when he would become eligible for parole). Accordingly, because the result urged by Goins is not dictated by clearly established federal law, his Fourteenth Amendment claims must fail.

22

2.

Additionally, Goins contends that he should have been permitted to introduce mitigating evidence regarding his life sentence under the Eighth Amendment's prohibition of cruel and unusual punishment. This claim is premised on the Eighth Amendment guarantee that the jury should "not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." Eaton v. Angelone , 139 F.3d 990, 996 (4th Cir. 1998) (quoting Lockett v. Ohio, 438 U.S. 586, 604 (1978) (plurality opinion)). As the district court recognized, however, Goins's contention -- that the trial court had a duty, under the Eighth Amendment, to instruct the jury that Goins would not be eligible for parole until he served at least thirty years of a life sentence -- would require the announcement of a "new rule" inapplicable to Goins on federal habeas corpus review. See O'Dell v. Netherland, 95 F.3d 1214, 1238 n.13 (4th Cir. 1996), aff'd, 521 U.S. 151 (1997). Accordingly, the district court correctly dismissed Goins's Eighth Amendment claim.

D.

Next, Goins asserts numerous errors by his trial and appellate counsel that allegedly deprived him of effective assistance of counsel. Specifically, Goins contends that: (1) his trial counsel inadequately investigated his case; (2) he was denied effective assistance during voir dire; (3) after the trial court granted Goins's motion for change of venue, his trial attorneys "simply acquiesced to the trial court's selection of a group of jurors with little understanding or exposure to the type of environment Goins was from," Br. for Appellant at 48 n.14; (4) he was deprived of effective assistance of counsel during the guilt phase of his murder trial by his attorneys' failure to call Barry Scott as a defense witness; and (5) his attorneys failed to introduce sufficient mitigating evidence and render an effective closing argument during Goins's capital sentencing proceeding.

The district court carefully considered Goins's ineffective assistance claims and concluded that the claims must fail"both because in some instances Goins cannot establish that trial counsel's perfor-

23

mance fell below an objective standard of reasonableness and because, even assuming this were established, Goins, in all instances, fails to show that any such deficiencies prejudiced either the trial or the sentencing." Goins, 52 F. Supp. 2d at 652. Likewise, we have carefully reviewed Goins's asserted instances of ineffective assistance and we are unable to conclude that the Supreme Court of Virginia's dismissal of these claims was unreasonable under Williams, supra.

E.

In addition, Goins asserts that he was improperly excluded from numerous bench conferences during the guilt phase of his murder trial. The Supreme Court of Virginia held this claim to be procedurally defaulted under the rule of Slayton v. Parrigan, 205 S.E.2d 680 (Va. 1974). Slayton proscribes state habeas review of claims that were available to petitioner at trial or on direct appeal, if petitioner failed to raise them at that time. Id. at 682.

We have consistently found the rule of Slayton to constitute an independent and adequate state procedural rule for the purposes of federal habeas procedural default analysis. See , e.g., Fisher v. Angelone, 163 F.3d 835, 844 (4th Cir. 1998). As a result, federal habeas corpus review of this claim is barred unless Goins can show that: (1) there is cause for, and actual prejudice from, the default; or (2) the failure to review the claim would result in a fundamental miscarriage of justice. Coleman v. Thompson, 501 U.S. 722, 749-50 (1991). Because Goins cannot make either showing, we affirm the district court's dismissal of this claim.

F.

Finally, Goins contends that the district court erred in denying his motion for an evidentiary hearing on his preserved claims. Pursuant to our decision in Cardwell, supra, a federal habeas corpus petitioner -- when denied the opportunity to develop an evidentiary basis for his claims in state court -- is entitled to an evidentiary hearing if he is able to allege "additional facts that, if true, would entitle him to relief." Id. at 338 (citation omitted). As the foregoing discussion indicates, however, Goins has not alleged facts that, if true, would war-

24

rant relief. Accordingly, the district court properly denied Goins's motion for an evidentiary hearing.

VI.

Pursuant to the foregoing, we conclude that Goins has failed to make a substantial showing of the denial of a federal constitutional right with regard to any of his assertions of error. See 28 U.S.C. § 2253(c)(2). Therefore, we decline to award Goins a certificate of appealability and we dismiss his appeal.

<u>CERTIFICATE OF APPEALABILITY</u>
<u>DENIED AND APPEAL DISMISSED</u>

25